# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KIM MEYER, | ) | CASE NO. 1:24-CV-00576-CEH |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | CARMEN E. HENDERSON |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant, | ) | |

## I. Introduction

Plaintiff, Kim Meyer seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 5). For the reasons set forth below, the Court AFFIRMS the Commissioner's final decision denying Meyer DIB.

## II. Procedural History

On December 4, 2014, Meyer filed an application for Supplemental Security Income ("SSI"), and on December 28, 2014, Meyer filed an application for DIB, alleging a disability onset date of July 19, 2014 (ECF No. 8, PageID #: 138–39, 330). The applications were denied initially and upon reconsideration, and Meyer requested a hearing before an administrative law judge ("ALJ"). (ECF No. 8, PageID #: 194–200, 203–05, 210–17). On August 15, 2026, an ALJ held a hearing, during which Meyer, represented by counsel, and an impartial vocational expert testified. (ECF No. 8, PageID #: 173). On November 22, 2016, the ALJ issued a written decision finding

1

Meyer was not disabled.  (ECF No. 8 PageID #: 182).  Meyer appealed the ALJ's decision, and on October 6, 2017, the Appeals Council vacated the decision and remanded to the ALJ, instructing the ALJ to address which findings from a prior ALJ decision relating to Meyer's disability status remained in effect and to further evaluate Meyer's mental status. (ECF No. 8, PageID #: 189–91).

On April 20, 2018, the ALJ held another hearing, during which Meyer, represented by counsel, and an impartial vocational expert testified. (ECF No. 8, PageID #: 44). On October 10, 2018, the ALJ issued another written decision, once again finding Meyer was not disabled. (ECF No. 8, PageID #: 57). Meyer again appealed the ALJ's decision, and on November 13, 2019, the Appeals Council held that Meyer was disabled under section 1614(a)(3)(A) of the Social Security Act and was entitled to SSI as of December 4, 2014, but was not disabled under sections 261(i) and 223(d) of the Social Security Act and thus not entitled to DIB. (ECF No. 8, PageID #: 1636). Meyer appealed the denial of DIB and the onset date for her SSI, and on August 11, 2020, the U.S. District Court, upon joint stipulation of the parties, remanded the case to the Commissioner of Social Security for further proceeding under Sentence Four of Section 205 of the Social Security Act, 42 U.S.C.§ 405(g). (ECF No. 8, PageID #: 1639–40, 1645). The District Court directed the Appeals Council to instruct the ALJ to give Meyer the opportunity for another hearing and to reassess Meyer's mental impairments and residual functional capacity ("RFC") and, in doing so, further evaluate the opinion of the consultative psychological examiner, Richard Davis. (*Id.*).

On December 3, 2020, pursuant to the District Court's instructions, the Appeals Council remanded Meyer's case and required that the case be assigned to a new ALJ. (ECF No. 8, PageID #: 1645–47). The Appeals Council affirmed the finding of disability for the purposes of SSI as of

December 4, 2014. (ECF No. 8, PageID #: 1645).[1] On July 12, 2021, a different ALJ held a hearing, by telephone due to the COVID-19 Pandemic, during which Meyer, represented by counsel, an impartial medical expert, and an impartial vocational expert testified (ECF No. 8, PageID #: 1554, 1652). On July 26, 2021, the ALJ issued a written decision finding that Meyer was not disabled under sections 261(i) and 223(d) of the Social Security Act and thus not entitled to DIB. (ECF No. 8, PageID #: 1663).  Meyer appealed this decision, and on May 19, 2022, the Appeals Council vacated the ALJ's decision regarding Meyer's disability under Title II and remanded to the ALJ to further evaluate whether Meyer's impairments met the severity of any listed impairment. (ECF No. 8, PageID #: 1674–75). On October 11, 2022, the ALJ held a hearing during which Meyer, represented by counsel, an impartial medical expert, and an impartial vocational expert testified. (ECF No. 8, PageID #: 1519, 1521). On March 6, 2023, the ALJ issued a written decision finding that Meyer was not disabled under sections 261(i) and 223(d) of the Social Security Act at any time from July 19, 2014, the alleged onset date, through June 30, 2015, the date last insured. (ECF No. 8, PageID #: 1508). The ALJ's decision became final on February 13, 2024, when the Appeals Council declined further review.  (ECF No. 8, PageID #: 1472).

On March 28, 2024, Meyer filed her Complaint to challenge the Commissioner's final decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 9, 11). Meyer asserts the following assignments of error:

> (1) The ALJ erred when he generally rejected the opinion of consultative examining psychologist, Dr. Richard Davis, without evaluating the specific work restrictions associated with extreme limitations in the ability to think logically, use common sense, and use judgment.

---

[1] The Appeals Council reaffirmed this finding in its May 19, 2022 order. (ECF No. 8, PageID #: 1674). The SSI disability onset date is not an issue herein.

3

(2) The ALJ's determination that Ms. Meyer can return to past relevant work as a telemarketer is not supported by substantial evidence and requires reversal and/or remand.

(ECF No. 9 at 13, 18) (emphasis omitted).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Meyer's hearing:

> In the initial report she filed in this matter, the claimant alleged she could not work because of breathing problems, left knee problems, left ankle problems, back problems, feet problems, and headaches (see Exhibit B3E:2). The claimant also reported she was obese. (*Id.*). In a January 2015 report, the claimant said she was depressed because of problems involving her mother, her brothers, and herself (see Exhibit B5E). The claimant also said she cried a lot, and that she did not like to go out by herself. (*Id.*). The claimant also reported problems breathing in addition to problems lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs (see Exhibit B5E:1 and 3). However, the claimant denied having problems reaching or using her hands (see, again, Exhibit B5E:3). In addition, the claimant denied having memory or concentration problems, or problems understanding things, following instructions, or interacting with others. (*Id.*). In an April 2015 report, the claimant reported problems breathing and problems with her knees, feet, and back in addition to problems lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs (see Exhibit B9E:1 and 6). However, the claimant denied having problems reaching or using her hands (see, again, Exhibit B9E:6). In addition, the claimant denied having memory or concentration problems, or problems understanding things, following instructions, or interacting with others. (*Id.*).

> The claimant testified at hearings held on August 15, 2016, and April 20, 2018, that she could not work during the period at issue because of chronic pain and greatly reduced ranges of motion related to her knee and back impairments. The claimant also said her pain was aggravated by performing simple chores and walking short distances. The claimant also alleged her impairments limited her ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs. The claimant testified that she treated her impairments by wearing a knee brace, taking pain medication, and bathing in Epsom salts. The claimant also said she experienced side effects of dry mouth,

4

dizziness, and difficulty concentrating. The claimant also alleged only being able to walk approximately 20 steps before experiencing weakness and back spasms. The claimant also said she could only stand for a couple of minutes due to back, knee, and ankle pain, and that she could only sit for 20 to 30 minutes.

At a July 12, 2021, hearing, the claimant testified she took medication for depression during the period at issue. The claimant also said she had symptoms of feeling sad and not wanting to do anything, and she said she had no ambition. The claimant also testified that pain affected her ability to concentrate.

At the hearing on October 11, 2022, the claimant testified that, during the period at issue, she was having severe pain in her knees and feet. The claimant also said she was unable to do even seated work during this time due to needing to take additional breaks for pain.

(ECF No. 8, PageID #: 1497–98).

## B. Relevant Medical Evidence

The ALJ also summarized Meyer's health records and symptoms:

The claimant has sought emergency room services for a variety of unrelated conditions, including abdominal pain, shortness of breath, headaches, and lesions (see, among other places in the record, Exhibits B2F, B3F, and B11F). Regarding the claimant's spine disorder, numerous physical examinations have been described as showing normal ranges of motion and the ability to ambulate normally (see, for example, Exhibits B2F, B3F, and B8F).

In June 2014, the claimant declined treatment of a steroid injection and was instead prescribed an exercise regimen (see Exhibit B3F:12 and 17). The claimant was also encouraged to lose weight (see Exhibit B3F:12). During this visit, the claimant said prior steroid injections "worked great" and relieved her pain for one month. (*Id.*).

On August 1, 2014, the claimant presented at the Emergency Department for left heel pain. On examination, the claimant was described as "alert" and "cooperative," and her mood and affect were described as "appropriate," and her judgment was described as "normal" (see Exhibit B1F:2).

On September 17, 2014, the claimant saw Douglas Van Auken, M.D., her primary care physician, in relation to knee pain (see

5

Exhibit B4F:11 to 13). Although the claimant's list of medications included Wellbutrin and Trazodone, the claimant denied sleep disturbance, anxiety, memory loss, inattention, or feelings of depression. (*Id.*).

On September 20, 2014, the claimant presented at the Emergency Department for shortness of breath and wheezing (see Exhibit B2F:3, 4, 8, and 9). Although the claimant's list of medications included Wellbutrin and Trazodone, the claimant denied sleep disturbance, mood disorder, or recent psychosocial stressors, and, on examination, the claimant's mood, affect, and behavior were "normal."

The claimant was treated emergently for shortness of breath on September 24, 2014 (see Exhibit B2F:3). However, the claimant's condition quickly improved with the administration of medication, and she did not require additional intensive treatments. In addition, it was later noted that the claimant's respiratory obstruction was "fully reversible with bronchodilators" (see Exhibit B11F).

In October 2014, the claimant underwent an orthopedic examination (see Exhibit B3F:4). The examination revealed the claimant had a stable knee with a "slight" effusion, and that she exhibited full leg strength. (*Id.*). The claimant was prescribed a supportive knee brace and instructed to maintain an exercise program. (*Id.*). The examination results did not describe debilitating pain or an inability to walk short distances. (*Id.*). In a follow-up visit, the claimant described wide-spread joint pain (see Exhibit B4F:14). However, rheumatoid arthritis and lupus examinations were negative. (*Id.*).

In February 2015, the claimant underwent a pulmonary study which showed normal oxygen saturations while resting and 91% saturation while walking (see Exhibit B8F:22 and 30). The claimant was compliant with her medication and did not report an inability to function at the time (see Exhibit B8F:21 to 24). The claimant was diagnosed with stable, partially reversible, "mild" obstructive ventilator impairment (see Exhibit B8F).

On February 17, 2015, the claimant told Mr. Davis, [a] consulting psychologist, that she was last employed in July 2010 as a cashier at Save-A-Lot (Exhibit B6F). The claimant told Mr. Davis she was there for eight months before being let go. (*Id.*). The claimant related that she had to call off frequently because of physical problems that rendered her unable to stand on her feet for the time that was required. (*Id.*). The claimant also told Mr. Davis she was taking medications for depression prescribed by her primary care

6

physician. (*Id.*). The claimant also said she had never been under the care of a mental health professional, and that she had never been hospitalized for emotional problems, and that she did not feel that she needed any help for emotional problems even though she said she had some depression. In terms of activities of daily living, the claimant reported that she cooked and performed household chores. (*Id.*). The claimant also said she read and watched television, and that she saw her mother every day, and that she helped her mother with whatever she needed. (*Id.*).

On examination, Mr. Davis described the claimant as appearing clean and neat, and as being very pleasant and cooperative (see Exhibit B6F). Mr. Davis also said the claimant understood the purpose of the examination, and that her flow of conversation and thought was satisfactory, and that she spoke coherently and what she said was relevant and organized. (*Id.*). In terms of affect and mood, the claimant said she sometimes felt that she was worthless, and that life was hopeless because of her past. (*Id.*). The claimant also said she wished she had been a better mother and had made better choices for the fathers of her children. (*Id.*). The claimant also said she had very little energy, which she attributed to depression. (*Id.*). In terms of sensorium and cognitive functioning, the claimant knew the year, the month, and the day of the week; she knew the president and the president before him; she did not know the governor of Ohio, but did know the mayor of her city; she was able to do serial 7's; she remembered only 5 digits forward and 4 in reverse; she was given 6 words to remember for 5 minutes and was able to recall half of them; and she seemed to possess better than average math skills. (*Id.*). Mr. Davis also said the claimant was extremely limited in her abilities to think logically, use common sense and judgment. (*Id.*). In support of this assessment, Mr. Davis said the claimant did very poorly on these items during testing, and that she presented with a life suggesting limitations in these areas. (*Id.*). As previously noted, Mr. Davis diagnosed the claimant with adjustment disorder with mixed anxiety and depressed mood. (*Id.*).

On April 6, 2015, the claimant's primary care physician, Dr. Van Auken, noted the claimant had sent him "psych and physical reports" (see Exhibit B7F:86 to 88). Dr. Van Auken further noted, "[t]he psych dx is not serious (depression) but the physical dx will go forward." (*Id.*). The claimant also complained at this visit of breathing problems and knee stiffness, but she did not complain of any psychological symptoms or problems. (*Id.*).

On June 23, 2015, the claimant went to Urgent Care for a migraine headache. On examination, the claimant was "alert," "well

groomed," and appeared to be in generally good health (see Exhibit B9F:5 and 6).

On July 14, 2015, that is just after the June 30, 2015, date last insured, the claimant reported that bike riding helped reduce her pain and she was going to the gym three days a week (see Exhibit B8F:7). Although the claimant's list of medications still included Wellbutrin, the claimant denied sleep disturbance, anxiety, memory loss, inattention, or feelings of depression (see Exhibit B8F:7 and 10).

The evidence in this case also shows mild degenerative changes in the claimant's lumbar and thoracic spines (see Exhibit B11F:8), and degenerative joint disease in her knees, and extreme obesity (the claimant's body mass index scores during the period at issue ranged between 44 and 50). I have also considered the fact that the claimant described herself in August 2016, that is 14 months after the June 30, 2015, date last insured, as using a treadmill to lose weight (see Exhibit B11F:8). The claimant also said she was able to do home exercises, but her time was constrained because she was providing daily care for her elderly mother. (*Id.*). The claimant's physical examination did not include a description of significant abnormalities or debilitating pain (see Exhibit B11F:10). In fact, she exhibited full ranges of motion and strength throughout her musculoskeletal systems except for some lumbosacral range limitations. (*Id.*). There were "mild" abnormalities in the left knee including a "mildly reduced" range of motion with "mild" left side crepitus. (*Id.*). The claimant was prescribed an intensive home exercise program, which was to increase in intensity over time (see Exhibit B11F:10 and 11). The claimant's prognosis was "great" if she maintained her exercise program. (*Id.*). It was also noted that weight loss was necessary "for her to get great relief of knee pain." (*Id.*).

(ECF No. 8, PageID #: 1498–1501).

## C. Opinion Evidence at Issue

Richard Davis, a consulting psychologist, evaluated Meyer for the first and only time on February 17, 2015, after referral by the Social Security Administration. (ECF No. 8, PageID #: 792, 1493). In his report, Mr. Davis noted that Meyer was "extremely limited in her abilities to think logically, use common sense and judgment," that she "did very poorly on these items" during

his evaluation of her, and that she "presents with a life suggesting limitations in this area." (ECF No. 8, PageID #: 795). The ALJ explained that he placed little weight on this opinion as it was not supported by the record and was contradicted by another of Mr. Davis's own observations. (ECF No. 8, PageID #: 1504–05). Meyer challenges the ALJ's decision to give little weight to Mr. Davis's opinion regarding her limited abilities to think logically and use common sense and judgment.

Dr. Laura Hopper, a psychologist who testified at Meyer's July 12, 2021 hearing, and two State agency psychologists, Patricia Kirwin, Ph.D. and Carl Tishler, Ph.D., who reviewed Meyer's case record in March 2015 and May 2015 respectively, opined that Meyer did not have a severe mental impairment. (ECF No. 8, PageID #: 115, 147, 1564–65). The ALJ placed "great weight" on these opinions as they were "supported by the evidence concerning the claimant's mental functioning." (ECF No. 8, PageID #: 1505). Meyer does not appear to challenge the weight the ALJ assigned to the opinions of these psychologists.

### IV.   The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 3. Through the date last insured, the claimant had the following severe impairments: degenerative joint disease of the knees, a healed left ankle fracture with minimal arthritis in the joint, obesity, lumbar degenerative disc disease and spondylosis, chronic obstructive pulmonary disease, and asthma (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR

404.1567(a) except for the following: She could lift and/or carry 10 pounds occasionally and small objects frequently. She could stand and/or walk for at least two hours in an eight-hour day. She could sit for at least six to eight hours in an eight-hour day provided she was allowed to stand at her workstation for five minutes after sitting for 45 minutes (the claimant could continue working while standing). She could only occasionally use foot controls with her left foot. She could not climb ladders, ropes, or scaffolds. She could occasionally climb ramps and stairs. She could not kneel, crawl, or crouch, and she could perform all other postural maneuvers on an occasional basis. She had no manipulative limitations. She had to avoid concentrated exposure to hot and cold temperature extremes and high humidity. She had to avoid concentrated exposure to fumes, odors, dusts, and gases. She had to avoid work at unprotected heights, around and using dangerous moving machinery, around hazards, or on wet, slippery, or uneven surfaces.

6. Through the date last insured, the claimant could perform past relevant work as a telemarketer. This is because this work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

(ECF No. 8, PageID #: 1493, 1496–97, 1507).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B.  Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

**C.  Discussion**

Meyer raises two issues on appeal. First, she argues that the ALJ failed to properly consider consulting psychologist Mr. Richard Davis's opinion. Second, Meyer asserts that the ALJ's

11

finding that through the date last insured she was able to perform past relevant work as a telemarketer was not supported by substantial evidence because the RFC failed to account for her mental impairments. The Court will take each argument in turn.

### 1. The ALJ Properly Considered Mr. Davis's Opinion

Meyer argues that ALJ did not address Mr. Davis's findings that she had extreme limitations in the ability to think logically, use common sense, and use judgment. She contends that the ALJ's "incomplete review of this critical evidence led to the unsubstantiated finding that [she] retained the residual functional capacity that is consistent with semi-skilled work." (ECF No. 9 at 14). At step four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e).

In evaluating claims filed before March 27, 2017,[2] ALJs are to weigh medical opinions according to the guidance set out in 20 C.F.R. § 404.1527(c).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has

---

[2] On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c), 404. 1520c(b)(2) ("The factors of supportability [ ] and consistency [ ] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . . ").

examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), *id.* § 404.1502, 404.1527(c)(2). . . .

Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). . . .

On the other hand, opinions from nontreating and nonexamining sources are never assessed for "controlling weight." The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375–76 (6th Cir. 2013).

As noted above, Mr. Davis, a consulting psychologist, evaluated Meyer on February 17, 2015 and completed a psychological report following that evaluation. In his report, Mr. Davis diagnosed Meyer as having an adjustment disorder with mixed anxiety and a depressed mood at a mild-to-occasionally-moderate severity. (ECF No. 8, PageID #: 795). Mr. Davis also noted that Meyer was "extremely limited in her abilities to think

logically, use common sense and judgment," that she "did very poorly on these items" during his evaluation of her, and that she "presents with a life suggesting limitations in this area." (*Id.*).

The ALJ considered the opinion and stated:

> I have considered the opinions of Mr. Davis, the above-mentioned consulting psychologist who evaluated the claimant on a sole occasion on February 17, 2015 (see Exhibit B6F). As previously noted, Mr. Davis described the claimant as being extremely limited in terms of her ability to think logically and use common sense and judgment. (*Id.*). In support of his opinion, Mr. Davis said the claimant did very poorly on these items during the evaluation. (*Id.*). Mr. Davis also said the claimant presented with a life suggesting limitations in this area. (*Id.*).
>
> I have placed little weight on Mr. Davis' description of the claimant as being extremely limited in terms of her ability to think logically and use common sense and judgment because of the lack of any other evidence of these problems, and because of the fact the claimant was able to engage in numerous activities of daily living during the period at issue. In addition, this opinion is not consistent with Mr. Davis' statement that if the claimant was granted benefits, "she definitely is capable of money management" (see Exhibit B6F:6).
>
> Regarding work-related mental abilities, Mr. Davis said in part that the claimant had minimal limitations in terms of her ability to understand, remember and carry out simple instructions, and in terms of her ability to interact with others, and in terms of her ability to manage stress (see Exhibit B6F:5). I have placed great weight on these opinions because they are consistent with the evidence referenced in this decision regarding the claimant's ability to understand, remember, and apply information, and the evidence regarding the claimant's ability to interact with others, and the evidence regarding the claimant's ability to adapt to changes and manage her affairs.
>
> My assessment [that] the claimant's impairments did not interfere with her ability to perform basic mental work-related tasks over any continuous 12-month period relevant to this decision is further supported by the opinions of Dr. Hopper, the above-mentioned psychologist who testified at the claimant's July 12, 2021, hearing, and by the opinions of Patricia Kirwin, Ph.D., and Carl Tishler,

14

>Ph.D., State agency psychologists who respectively reviewed this record on March 5, 2015 and May 23, 2015 (see Exhibits B2A, B3A, B6A, and B7A). In pertinent part, these sources said the claimant did not have a severe mental impairment(s), opinions I have placed great weight on because they are supported by the evidence concerning the claimant's mental functioning referenced in this decision.

(ECF No. 8, PageID #: 1504–05).

Meyer argues that the ALJ erred in failing to address Mr. Davis's findings that she is extremely limited in her ability to think logically and use common sense and judgment. She further asserts that these limitations were not accounted for in the ALJ's opinion and suggests that a court could not follow the path of the ALJ's reasoning for excluding severe mental impairments from her RFC because the ALJ did not address the extreme limitations identified by Mr. Davis, and thus the court cannot uphold the ALJ's decision as his reasons "do not build an accurate and logical bridge between the evidence and the result." (ECF No. 9 at 15) (quoting *White v. Comm'r of Soc. Sec.,* No. 1:20-CV-00588-JDG, 2021 WL 858662, at *20 (N.D. Ohio Mar. 8, 2021) (quoting *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio Mar. 1, 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)))). Meyer argues that that the ALJ ignores the specific limitations on logic, common sense, and judgment and instead focuses only on her depression issues, thus the ALJ's reasoning[3] for rejecting Mr. Davis's findings on logic, common sense, and judgment constitutes "cherry picking" of evidence.

---

[3] Initially Meyer argues that the ALJ failed to address Mr. Davis's findings related to limitations in Meyer's ability to use logic, common sense, and judgment, but later in her brief, Meyer acknowledges that the ALJ considered Mr. Davis's findings related to logic, common sense, and judgment and merely appears to disagree with the ALJ's decision to give these findings little weight. (*See* ECF No. 9 at 14, 16).

The Commissioner responds that the ALJ expressly stated that he "placed little weight" on Mr. Davis's findings that Meyer was extremely limited in her ability to think logically and use common sense and judgment because the record lacked other evidence of these problems, Meyer was able to engage in many activities of daily living, and the assessment seemed inconsistent with Mr. Davis's other findings—specifically that Meyer "definitely is capable of money management." (ECF No. 11 at 7). The Commissioner argues that the ALJ's assessment of Mr. Davis's findings and decision to exclude severe mental impairments from Meyer's RFC was reasonable in terms of both supportability and consistency. (*Id.*). The Commissioner additionally notes that the ALJ's decision was further supported by opinions of psychologists, Dr. Hopper, Dr. Kirwin, and Dr. Tishler, who reviewed the record, including Mr. Davis's report, and found Meyer did not have severe mental impairments. (*Id.*). The Court agrees.

Mr. Davis was not a treating medical source. Thus, his opinion is not entitled to controlling weight. However, Mr. Davis examined Meyer and is therefore considered a nontreating, examining medical source. "With regard to nontreating, but examining, sources, the agency will simply '[g]enerally [ ] give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined' him." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (quoting 20 C.F.R. § 404.1527(d)(1)); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). To determine how much weight to give Mr. Davis's opinion, "the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the [source] offered in support of [their] opinion, how consistent the opinion is with

the record as a whole, and whether the [source] was practicing in [their] specialty." *Ealy*, 594 F.3d at 514 (citing 20 C.F.R. 404.1527(d)).[4]

The record shows that the ALJ considered relevant factors in his determination to give little weight to Mr. Davis's opinion. In explaining the little weight that he gave to Mr. Davis's findings that Meyer was extremely limited in her ability to think logically, use common sense, and use judgment, the ALJ explained that there was a lack of any other evidence of these limitations. A review of Mr. Davis's report supports this explanation by the ALJ. Mr. Davis writes that Meyer suffered from these extreme limitations in her abilities to think logically, use common sense, and use judgment but provides no evidentiary support for these findings. He writes that Meyer "did very poorly on these items" but fails to explain any tests that he conducted or observations he made to form these determinations.[5]  In fact, in the beginning of his report, Mr. Davis explains that "no tests were administered." (ECF No. 8, PageID #: 792). There is sufficient support for the ALJ's conclusion that Mr. Davis's opinion regarding Meyer's limitations in logical

---

[4] Meyer in error states that "valuable weight . . . *must* be assigned to an examining physician['s opinion]." (ECF No. 9 at 18) (emphasis added). Generally, the agency gives more weight to an examining source's opinion than it gives a non-examining source's opinion, but the amount of weight an ALJ should give even an examining source's opinion depends on factors such as the "length and nature of the treatment relationship, the evidence that the [source] offered in support of [their] opinion, how consistent the opinion is with the record as a whole, and whether the [source] was practicing in [their] specialty." *Ealy*, 594 F.3d at 514.

[5] Mr. Davis's report suggests that he had Meyer complete a few memory-related assessments, asking her to try to remember a series of numbers and words, but his report fails to explain how Meyer's performance in these activities would indicate extreme limitations in her abilities to think logically, use common sense, or use judgment. (ECF No. 8, PageID #: 795).

17

thinking, common sense, and judgment was not supported by relevant evidence. The Court finds no error with this determination.

Additionally, the ALJ concluded that Mr. Davis's opinion regarding Meyer's extreme limitations in her ability to think logically, use common sense, and use judgment was inconsistent with Meyer's engagement in activities of daily living and with another of Mr. Davis's own assertions in the same report. During the period at issue, Meyer was able to shop, drive, manage money, cook, clean, and help care for her disabled partner and ill mother. The ALJ indicated that such activities are inconsistent with extreme limitations in the ability to think logically, use common sense, and use judgment and cited this as a reason for discounting that portion of Mr. Davis's opinion.

Meyer takes issue with the ALJ's describing her participation in these activities of daily living as inconsistent with Mr. Davis's findings that she is extremely limited in her ability to think logically, use common sense, and use judgment. She appears to argue that these activities are not comparable to work activities and that her mere participation in such activities does not indicate that she could have completed semi-skilled work activities on a sustained basis. But the ALJ did not assert that Meyer's participation indicated she was capable of semi-skilled work on a sustained basis. He merely indicated that participation in these activities was inconsistent with Mr. Davis's findings. Further, he did not rely solely on Meyer's participation in these activities to support his inconsistency determination. He additionally pointed to another finding made by Mr. Davis in the same report—that if Meyer was granted benefits, "she definitely is capable of money management," (ECF No. 8, PageID #:796)—and explained that this finding was inconsistent with Mr. Davis's

18

contemporaneous finding that Meyer possessed extreme limitations in her abilities to think logically, use common sense, and use judgment. *See Coe v. Soc. Sec. Admin.*, No. 2:20-CV-00029, 2022 WL 1216572, at *7–8 (M.D. Tenn. Feb. 8, 2022), *report and recommendation adopted*, No. 2:20-CV-00029, 2022 WL 672153 (M.D. Tenn. Mar 7, 2022); *Harrington v. Kijakazi*, No. 3:22-67-KKC, 2024 WL 420109, at *3 (E.D. Ky. Feb. 5, 2024); *Debra A.H. v. Comm'r of Soc. Sec.*, No. 2:20-CV-5482, 2022 WL 345184, at *3–9 (S.D. Ohio Feb. 4, 2022); *see also Wells v. Comm'r of Soc. Sec.*, No. 1:22-CV-01969, 2024 WL 1340187, at *3, 5–6 (N.D. Ohio Mar. 29, 2024) (including a claimant's ability to manage money as a factor considered when determining whether a claimant has a mental impairment requiring a limitation in the RFC). This is sufficient.

Further, following a lengthy review of the record evidence related to Meyer's mental impairments, the ALJ noted, in support of his decision to give little weight to Mr. Davis's findings related to Meyer's abilities to think logically, use common sense, and use judgment, that the record lacked any other evidence that Meyer possessed these limitations, and thus these findings were inconsistent with the record. Rather, as discussed by the ALJ, the record supports the ALJ's decision to not include mental limitations in the RFC.

While Mr. Davis diagnosed Meyer with an adjustment disorder and mixed anxiety and depressed mood disorder and Meyer was prescribed Wellbutrin and Trazodone by her primary care physician, she was never psychiatrically hospitalized, never visited the Emergency Department due to psychiatric symptoms, and never required or received outpatient mental health services. During the time period relevant to this claim, Meyer's treatment providers did not document abnormal psychiatric findings, only normal findings.

At medical appointments, Meyer denied sleep disturbance, anxiety, memory loss, inattention, or feelings of depression. (ECF No. 8, PageID #: 481, 583). In function reports that Meyer completed about herself, she reported being depressed but did not report that any conditions affected her memory or her ability to complete tasks, concentrate, understand, follow instructions, or get along with others. (ECF No. 8, PageID #: 378, 382, 405, 407). These function reports also reflect that Meyer had a high level of functioning in terms of completing household chores, taking care of her mother and partner, managing money, and driving, despite her claims that she felt sad and did not want to do anything. (ECF No. 8, PageID #: 377, 380, 401, 403, 1563). Meyer's treatment records further indicate that she was able to understand, remember, and recall information. They do not seem to indicate that Meyer made any complaints that she had an inability to adapt to changes or manage her affairs, nor that Meyer was observed to have issues in these areas. Meyer's treatment records also do not include reports that she appeared to have issues interacting with others. Rather, Meyer was described as having normal behavior on various occasions during the relevant time period and was said to be capable of concentrating during evaluations, including when she was evaluated by Mr. Davis.  (*See, e.g.*, ECF No. 8, PageID #: 354, 470, 476, 794–96). Within his report, Mr. Davis additionally said that Meyer had only minimal limitations in her abilities to understand, remember, carry out simple instructions, interact with others, and manage stress. (ECF No. 8, PageID #: 795). The ALJ placed great weight on this finding of Mr. Davis's as it was consistent with other record evidence regarding Meyer's abilities to understand, remember, and apply information, interact with others, and adapt to changes and manage her affairs. (ECF No.

8, PageID #: 1505). This is ample evidence to permit a reasonable mind to accept the ALJ's conclusion.

Moreover, the ALJ's determination not to include limitations based on mental impairments in Meyer's RFC is consistent with the opinions of State agency reviewing psychologists and an impartial testifying psychologist who found that Meyer did not have severe mental impairments. (ECF No. 8, PageID #: 115, 147, 1564–65). The ALJ has given these opinions great weight as they are supported by the record evidence related to Meyer's mental functioning discussed above, and Meyer does not challenge the weight given to these opinions. Additionally, the ALJ's decision not to include mental limitations in Meyer's RFC is further supported by the opinions of State agency physicians who reviewed the record and found that there was no need to make edits to Meyer's RFC from a previous disability determination, which did not include mental limitations.[6] (ECF No. 8, PageID #: 118–19, 150–51).

Still, despite the ALJ's reviewing the significant volume of evidence in support of his determination that Meyer does not possess a severe mental impairment requiring mental limitations in her RFC, Meyer argues that by rejecting Mr. Davis's opinion that she was extremely limited in her abilities to think logically, use common sense, and use judgment, the ALJ "cherry picked" evidence. This argument fails. True, "[i]t is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'" *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-

---

[6] The RFC the ALJ assesses Meyer as having in this case is the same RFC as a different ALJ found in Meyer's previous disability case, with two minor exceptions unrelated to mental impairments. (ECF No. 8, PageID #: 1480–81).

2313, 2013 WL 943874, at *6 (N.D. Ohio Mar. 11, 2013) (quoting *Goble v. Astrue*, 385 F. App'x 588, 593 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009))). But "the ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Id.* (quoting *Solembrino v. Astrue*, No. 1:10-CV-1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011)). Here, Meyer claims the ALJ's rejection of Mr. Davis's opinion that Meyer had severe limitations in abilities to think logically, use common sense, and use judgment amounted to "cherry picking" and cites language that an ALJ "may not distort the evidence by 'cherry-picking' only a few selective portions of it while ignoring its true overall nature." *Damron v. Comm'r of Soc. Sec.*, No. 3:16 CV 322, 2017 WL 395782, at *7 (N.D. Ohio Jan 30, 2017). The ALJ accepted some portions of Mr. Davis's opinion, finding that they were supported by the record, but rejected the portion relating to limitations in logical thinking, common sense, and judgment, holding that these limitations were not supported by the evidence. As discussed above, the ALJ thoroughly reviewed the record evidence, and that evidence supported his decision to disregard this portion of Mr. Davis's opinion. Thus, the Court rejects this argument.

Meyer additionally argues that the ALJ wrongfully "played doctor" by impermissibly substituting his own judgment on medical issues for that of medical professionals. (ECF No. 9 at 17–18). Specifically, she argues that the ALJ exceeded his role by placing little weight on Mr. Davis's opinion that she was extremely limited in her abilities to think logically, use common sense, and use judgment and finding that she was capable of her past work. This argument, too, falls flat. "An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence

before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. App'x 435, 439 (6th Cir. 2010) (citing *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009)). As illustrated above, the ALJ's decision to give little weight to that portion of Mr. Davis's opinion and ultimate determination not to include mental limitations in Meyer's RFC were supported by substantial evidence. Accordingly, the Court finds no reason to disturb these decisions.

### 2. Substantial Evidence Supports the ALJ's RFC and Finding that Through the Date of Last Insured Meyer Could Perform Past Relevant Work as a Telemarketer

Meyer argues that the ALJ erred in finding that through the date last insured, she could return to her past work as a telemarketer, thereby effectively challenging the ALJ's RFC determination.

At step four, the ALJ determines a claimant's RFC and whether a claimant can do her past relevant work. 20 CFR § 404.1520(a)(4)(iv). An RFC is "the most you can still do despite your limitations." *Id.* § 404.1545(a)(1). The RFC is based on all the relevant evidence in the claimant's record. *Id.* A court reviewing an RFC "decide[s] only whether there was substantial evidence to support the ALJ's RFC determination." *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 406 (6th Cir. 2018). If there is substantial evidence, the court will "defer to that decision even in the face of substantial evidence supporting the opposite conclusion." *Id.*

The ALJ concluded that Meyer, through the date last insured, had the ability to:

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) except for the following: She could lift and/or carry 10 pounds occasionally and small objects frequently. She could stand and/or walk for at least two hours in an eight-hour day. She could sit for at least six to eight hours in an eight-hour day provided she was allowed to stand at her workstation for five minutes after sitting for 45 minutes (the claimant could continue working while standing). She could only occasionally use foot controls with her left foot. She could not climb

> ladders, ropes, or scaffolds. She could occasionally climb ramps and
> stairs. She could not kneel, crawl, or crouch, and she could perform
> all other postural maneuvers on an occasional basis. She had no
> manipulative limitations. She had to avoid concentrated exposure to
> hot and cold temperature extremes and high humidity. She had to
> avoid concentrated exposure to fumes, odors, dusts, and gases. She
> had to avoid work at unprotected heights, around and using
> dangerous moving machinery, around hazards, or on wet, slippery,
> or uneven surfaces.

(ECF No. 8, PageID #: 1497).

Within fifteen years of her date of last insured, Meyer previously worked as a telemarketer, which according to the Directory of Occupational Titles, is semi-skilled work at the sedentary exertional level. (ECF No. 8, PageID #: 1507). This too is how Meyer performed her telemarketing work. (*Id.*). After comparing Meyer's RFC with the physical and mental demands required to work as a telemarketer, the ALJ found, through the date last insured, Meyer was able to perform telemarketing work as it is generally performed. (*Id.*).

Two vocational experts found that a hypothetical person with an RFC mirroring Meyer's[7] could perform her past work as a telemarketer. (ECF No. 8, PageID #:1543–44, 1947–49). Meyer again argues that the ALJ's rejection of Mr. Davis's findings regarding her limited abilities to use judgment, common sense, and logic, and failure to include Mr. Davis's findings in her RFC was harmful error, resulting in an inaccurate finding that she could return to past work as a telemarketer. (ECF No. 9 at 19).

Meyer explains that the hypothetical scenarios the ALJ presented to the vocational experts

---

[7] The hypothetical posed to the vocational expert in the October 11, 2022 hearing (ECF No. 8, PageID #: 1543–44) differs slightly from that used in the interrogatory posed to the vocational expert on November 16, 2022 (ECF No. 8, PageID #: 1946–49) and the RFC ultimately adopted by the ALJ (ECF No. 8, PageID #: 1497). These differences relate to Meyer's physical abilities—e.g. her ability to walk/ stand for four hours compared to two hours—and do not relate to Meyer's mental impairments. Meyer does not take issue with these differences in hypotheticals.

24

did not include the mental limitations Mr. Davis found and further notes that the vocational expert testified that a hypothetical person with extreme limitations in their ability to think logically and use judgment or common sense could not perform Meyer's past work as a telemarketer.[8] (ECF No. 9 at 19; ECF No. 8, PageID #: 1547).  The Commissioner argues that because the RFC need only contain limitations that are supported by the record, Meyer's attack on the ALJ's RFC determination and argument that the ALJ's proposing hypotheticals excluding mental limitations constituted harmful error is misplaced. (ECF No. 11 at 8). The Court agrees with the Commissioner.

As cited by the Commissioner, "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). As discussed above, the ALJ explained that he gave little weight to Mr. Davis's finding that Meyer has extreme limitations regarding her ability to use good judgment, common sense, and logic, and this decision was supported by substantial evidence. Further, as illustrated above, the record as a whole supports the ALJ's determination to exclude mental limitations from Meyer's RFC. Thus, the ALJ's decision to exclude the mental limitations identified by Mr. Davis was supported by substantial evidence, and the ALJ did not err in proposing a hypothetical to the vocational experts without those mental limitations.

Further, there was sufficient evidence in the record to support the ALJ's finding that through the date last insured, Meyer could return to work as a telemarketer. The vocational experts' testimony that a person with Meyer's RFC—properly excluding the mental limitations posed by

---

[8] Meyer does not appear to challenge the vocational expert's findings that a person with Meyer's RFC, as it appears above, without the extreme mental limitations found by Mr. Davis, could resume her past work as a telemarketer.

Mr. Davis—could perform her past work provides substantial evidence for the ALJ's decision. *See Thompson v. Comm'r of Soc. Sec.*, No. 3:11-CV-493-H, 2012 WL 2089709, at *12 (W.D. Ky. May 7, 2012) ("The testimony of a vocational expert may be substantial evidence to support a decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant." (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512–13 (6th Cir. 2010))), *report and recommendation adopted*, No. 3:11-CV-493-H, 2012 WL 2089708 (W.D. Ky. June 8, 2012). "[T]he hypothetical question to the [vocational expert] need not incorporate those limitations asserted by the claimant that are properly rejected by the ALJ based upon his independent review of the record." *Id.* (citing *Foster v. Halter*, 279 F.3d 348, 356–57 (6th Cir. 2001)).

Meyer attempts to make a final argument regarding the ALJ's failure to include mental limitations in her RFC by asserting that she had severe physical impairments, including "degenerative joint disease of the knees, a healed left ankle fracture with arthritis, lumbar degenerative joint disease, and spondylosis," that caused her to suffer pain that "eroded her capacity to perform skilled or semi-skilled work." (ECF No. 8 at 19). She argues that the ALJ recognized that she had such physical impairments but erred in failing to impart mental limitations as a result of her having these physical impairments. (*Id.*). This argument is not well taken. Meyer, who, as the claimant, has the burden to prove an impairment exists, *see Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997), fails to include a single record citation to any medical evidence showing that her physical impairments did indeed "erode" her mental functioning. Further, as described above, substantial record evidence suggests that through the date last insured, Meyer did not suffer from mental impairments that would prevent her from returning to past work as a telemarketer. Accordingly, Meyer's second argument is without merit.

**VI. Conclusion**

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying Meyer DIB.

IT IS SO ORDERED.

Dated: September 18, 2024

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE